The next case for oral argument this morning is Appeal No. 24-2166, Jones v. Das. Good morning, Mr. Stein. Good morning, Your Honors. May it please the Court, my name is Gil Stein and I am Court Appointed Counsel for Appellant Tonette Jones in this matter. In a nutshell, Your Honors, the District Court's decision that is up on appeal here today should be reversed because our case turns on questions concerning the merits and motivations behind some alleged performance failures that the appealee cited to fire Ms. Jones. Consider four examples out of a litany of some 10 different ones that are in the record. Why was Ms. Jones fired for calling her supervisor a racist when her accuser recanted that same accusation as coerced by officers under the appellee's command? Why was Ms. Jones in fact insubordinate when she refused to tell a court that it had a trafficking report, a sex trafficking report, that Ms. Jones believed that the court did not in fact have? Did Ms. Jones exceed her authority when she accurately warned juveniles about the consequences of not meeting with their probation officers? And then we have the question of did Ms. Jones violate a disputed no-child-in-the-office policy just because she removed her son from the building's public lobby? Now, if the court is wondering how a jury might infer racism from the accusations against Jones, the answer to that question can be found in at least two facts that are undisputed. First, none of Ms. Jones' comparators were disciplined after they engaged in some of the same behaviors that Ms. Jones did. And second, Appali Avikdas, who importantly the court should note is the senior most officer in the department, I believe his title was that of director, openly used the N-word in front of Ms. Jones' Black colleagues. Now, I want to stress that is not the sum total of our case, and I understand that it wasn't said directly to Jones and that she heard about it secondhand. That is not the sum total of our case, but our point is that the district court did not consider that fact along with the others by giving it the weight that it should deserve. What happened here is when the district court was faced with jury questions at summary judgment, it improperly weighed only some of the evidence, specifically three of the 10 different incidents at issue, before it discounted Appali's misbehavior as an, I quote, or isolated incidents that did not prove a race-based hostile work environment. I want to stress the word prove, that is a direct quote out of district court's decision. As this court's holdings in cases like Hall v. City of Chicago and the Johnson v. Advocate Health Care Center make clear, Ms. Jones did not have to prove her claims at summary judgment. What she had to do is offer sufficient evidence of her claims based on all reasonable inferences from the totality of the circumstances. This is the controlling standard at summary judgment, and this standard demonstrates that the district court erred here. When our record is viewed in its totality, a reasonable jury could at the very least infer that racial animus motivated Jones's termination after her workplace was altered by her supervisors, as she says, baseless and humiliating accusations. Mr. Stein, you mentioned comparators. Can you go through the comparators that you believe would give rise to an inference of race-based decision making? Yes. And let me preface my answer by saying it's not just the actual comparators that I will tell you about that we rely on for the race-based decision making, but let me start with the two comparators. For example, there were officers Grunauer and Petla that are discussed, who there's evidence to show that they engaged in what we think is more serious misconduct than Ms. Jones, and they suffered very minor and no discipline. Specifically, between those two officers, and forgive me for not remembering which one of them did what, but there was falsification of workload records, and there were records that were never even processed at all. So I don't know if it was laziness or just work that was not done for quite some time, which put the juveniles affected on those files at risk and a prolonged incarceration that may have been unnecessary. And I believe that Ms. Jones discusses them in her declaration on paragraph 17. Do we have any other evidentiary basis to make that comparison other than her declaration? Yes. So with respect to other comparators, there is Ms. Jones' testimony, of course, which by itself should suffice to create a question of fact about how other African Americans were treated less favorably than non-African Americans in the department. And we can talk about Jason Smith's declaration in a moment, but that's corroborated also by Jason Smith. My point is, even if we throw out the Smith declaration, Ms. Jones' statements bring into dispute a question of fact about whether others in the department were treated less favorably, others who also happened to be, of course, Black probation officers. From that, you're referencing what Ms. Jones related about when African Americans would have conversations with various supervisors, right? I'm referencing the fact that there's testimony in the record from Ms. Jones and also Mr. Smith that they were treated in a more aggressive manner by Ms. Kintzler, yelled at, she was ruder to them. Admittedly, not the most serious questions in this case, but the point is they fit into a pattern, which under the totality of the circumstances view, we believe shows that there was a race-based hostility. And let me give you some of these other facts, Your Honor. This is important. As the court knows from its decision in the Monroe case, discriminatory intent can be inferred from phony reasons for discipline alone. We have that in this case. Whether they're really phony or not, that is a question of fact, but we've alleged that they're phony. We believe there's good reasons to support that allegation. Also, there's evidence in this record that shows that DAS, as I said, used the N-word. Comparators brought their children to work. It's undisputed. The comparators brought their children to work without any consequences. It's undisputed that Ms. Jones was the only person they could identify who had ever been disciplined for this alleged policy, which some of the witnesses said they didn't even know that it ever existed. It's undisputed that other comparators... American employees who brought their children to work who weren't disciplined? No. Other white probation officers brought their children to work and were never disciplined. And how did Ms. Jones know that? She saw it. And it's undisputed that white probation officers wrote letters to parents of juveniles and juveniles informing them that they need to comply with the conditions of their probation or they could get into trouble. And they were never disciplined. So those are the bases for the comparators in this case, and I submit that that needs to be considered again altogether, not just cherry-picking one or the other least severe examples and arguing that, of course, the workplace does not guarantee a frictionless work environment. This is not hostility. If I may reserve the two minutes for my rebuttal. Thank you. Mr. Griffiths. Good morning, your honors. May it please the court. Assistant Attorney General Carson Griffiths on behalf of defendants. This court should affirm the district court's grant of summary judgment for three reasons. First, Jones did not suffer harassment, let alone severe or pervasive harassment as required to make out a race-based hostile work environment claim. Second, there was no evidence that if such harassment had occurred, it was based on her race. And third, there was no abuse of discretion in the district court's decision to strike Jason Smith's declaration due to Jones's noncompliance with Rule 26. So turning first to the issue of severe or pervasive harassment, to survive summary judgment, Jones had to point to evidence of extreme conduct that amounted to a change in the terms and conditions of her employment. She did not. Rather than harassment, Jones faced routine workplace discipline for conduct that she indisputably committed. After all, Jones admitted that she called a superior officer unprofessional. She responded insubordinately to a superior's direction that she comply with the office's no children in the office policy. She passed a note to a juvenile court judge with information that her immediate supervisor told her to omit from a social investigation report. She refused to make mandatory revisions to a different social investigation report. She sent letters to juveniles' parents and their schools that her department head, Avik Das, viewed as unnecessarily coercive. And she made inappropriate comments about Eileen Kinsler, her immediate supervisor in the department's official computer system. Now, for her part, Jones largely ignores this evidence on appeal. She persistently says that she was falsely accused of this conduct, but again, she admitted to most of the misconduct, underpinning the accusations against her. I'd like to touch on the four instances that Mr. Stein discussed today, supporting his alleged claims that there were false accusations of this conduct. So first, the issue of Ms. Jones bringing her son into the office. To clarify, she was not disciplined for bringing her son into the office. As Avik Das made clear, and as his decision letter sets forth, she was disciplined for responding insubordinately when told to comply with that policy going forward. She essentially told Deputy Chief Probation Officer Kelly, I'm not going to listen to you anymore. I'm only going to listen to directions from the sheriff circumventing the department's chain of command. That's insubordination, not violating the no children policy. Next, the coercive letters that she wrote. Jones, on appeal, points simply to her declaration to support her assertion that these letters were proper. In her declaration, she says, there was nothing wrong with these letters, but this court has made clear in the Title VII context, an employee's subjective view of their own performance cannot withstand summary judgment. And regardless, as Das made clear in his deposition testimony, even if there were some factual statements that were technically true, the tenor of them was too coercive because they suggested a juvenile would be taken into custody if he didn't comply with Ms. Jones' directions, and also that a juvenile's parent could lose custody of her son if she didn't comply with Jones' directions. So they were, on the whole, even if technically accurate, improperly coercive. Next, this idea of making the revisions to the TL social investigation report and the human trafficking assessment that Mr. Stein referenced. Jones' claim was premised on the notion that making those revisions would require her to perjure herself to the juvenile court. But the only falsehood she identified was a statement that Ms. Kinsler told her to insert, that it was her understanding that a human trafficking assessment had been completed and was submitted to the court. Jones, according to her, couldn't say that because she didn't have a copy of the report. But at her deposition, she also admitted that the report's author told her that she prepared the report and filed it with the juvenile court, which was in fact true. It was filed in April 2017. And Kinsler's revisions made clear, as Jones said, that PO, Probation Officer Jones, quote, does not have a copy of the report at this time. There's nothing false about the revisions that Kinsler told her to make. And regardless of whether that edit was factually accurate or not, there's no dispute that Jones defied Kinsler's directions to make the edit. And then ultimately resulting in the department being embarrassed in the eyes of the juvenile court. Finally, the accusation that Jones called Ms. Kinsler racist, even assuming for purposes of summary judgment that she was falsely accused of making that statement, it had no effect on the conditions of her employment because it was not reported to Director Doss until Doss had already suspended Jones. So she was not working when that was related to Doss. There could be no change to her employment conditions at that time. And she never returned from that suspension. So although that comment factored into Doss's decision to discharge her, Jones disclaimed reliance on that discharge as a sort of severe pervasive harassment, forming the basis of her hostile work environment claim in response to our motion for summary judgment because she knew she had an exhaustion problem if she did so. So, and even I want to now turn to the issue that even assuming any of there were questions of fact as to any of those facts, which there are not, there was no evidence that any of them were motivated by race. The evidence showed that Doss terminated Ms. Jones for the reasons set forth in his decision letter, every single one of which was related to her job performance, not her race. That fact was undisputed by Jones in her response to our Rule 56.1 statements of material fact. So even if that decision was harsh, or if it was unfair, or if it was factually mistaken, it wasn't race based. In fact, even if it was motivated by personal animus, which to be clear, there is no evidence of such personal animus, but even if there were, that would not be enough to survive summary judgment on a hostile work environment claim based on race. What about Mr. Stein's argument that the comparators that Ms. Jones has identified support that it's race based? Neither of those comparators would raise a genuine issue of material fact. As this court has made clear in both the Title VII context and in the hostile work environment context, employees accused of misconduct have to have similar instances of misconduct. There can't be distinguishing features that would give the employer reason to treat the employees differently. So, for instance, in this court's decision in Reed, the court held that the fact that the plaintiff had multiple instances of violating an attendance policy and had been told to comply and still violated it, set her apart from other employees who had maybe only a few instances of violating the attendance policy. Here, the comparators are even further afield than that, far further afield. So, Ms. Patla, according to Ms. Jones, quote, incorrectly submitted a custodial sheet to the juvenile court, and Mr. Brunauer failed to log into the computer system and failed to complete work. Neither of them had instances of direct insubordination like Ms. Jones. Neither of them said, I'm not obeying your orders and I'm not listening to you about any policies, which is exactly what Ms. Jones did. As for the comparators who brought their children into the office, again, I just want to emphasize Ms. Jones was not disciplined for bringing her children to the office. It was for her response when told to comply going forward. So that sets them apart. As for Director Das' use of the N-word at a meeting of African American employees, the evidence showed that he read that word off of a document in front of a group of employees in early 2016. Ms. Jones was not present for that meeting. It occurred over a year before her performance issues began, and nearly two years before Das decided to terminate her, and notably over a year before he was even made aware of all the allegations brought against her by Deputy Chief Probation Officer Kelly and Supervisor Kinsler. So there's really no evidence there that that comment was in any way connected to Das' decision to suspend or terminate Jones. Nor was there any connection between Das' statement and Kelly and Kinsler's interactions with Jones. And again, that was the conduct that formed the basis to ultimately discharge her. So it's just not enough to create a genuine issue of material fact here. Finally, with my remaining time, I'd like to briefly address the striking of Smith's F declaration. Jones did not disclose Smith as a potential witness as required by Rule 26 until discovery was virtually closed. Only one deposition was remaining to be taken. She identified him as a source of documents in an earlier response to an interrogatory, but that does not comply with Rule 26's disclosure requirements. There was no indication that he was going to be a potential witness supporting her claims. And in any event, any error in striking the declaration was harmless because it wouldn't have created a genuine issue of material fact. The comparators in Smith's affidavit also did not have the same history of insubordination as Jones. They committed other types of misconduct like using drugs or submitting incorrect paperwork. And the general statement that Deputy Chief Probation Officer Griffin raised her voice and acted in a condescending manner towards certain African American officers, not Jones, was certainly not evidence that she engaged in a severe or pervasive race-based harassment toward Jones. So unless this court has any questions, we ask that you affirm the District Court's judgment. Thank you. Thank you. Mr. Stein? Thank you, Your Honors. Let me talk briefly about Das' comment. This court's holdings in the Rogers case and the Johnson case and the Schwab case make the following clear. A ranking senior supervisor's use of a racial epithet is significant when assessing if it creates a race-based hostile work environment. And these cases also establish that knowledge of a racial epithet is something that should be weighed when considering how it defined the work environment and whether it created a race-based hostile work environment. Again, this is not the only factor in this case, but the use of the N-word by the uppermost director of the department that Jones found out about is a significant factor. And let me just be clear on the chronology. Ms. Jones was employed at the department from February of 2015 to March of 2018. The epithet was used in May of 2016, and Ms. Jones found out about it from an email from Mr. Smith on May 30 of 2016. Unlike the cases that were cited by the district court on this issue, where the utterer of the racial epithet was not in the chain of command of the listener and or the listener heard about the utterance some eight months after it was uttered, that is not the case here. So it is an important factor to consider. Again, not a dispositive factor by itself. Does it matter that he was not addressing a particular person, but rather reading from a document? Well, that was what Avik Das tried to explain before he issued an apology letter and after he flat out denied using the racial epithet. It is not how it was construed by those in the room, and we know that from Mr. Smith. It is not how Ms. Jones understood it when she heard that it was used. So it's the impact on Ms. Jones that controls whether she was believed that she was experiencing a race-based hostile work environment. I see that my time is up, Your Honors. Thank you, Mr. Stein. Mr. Stein, you were appointed in this case to represent Ms. Jones. Thank you very much for your appointment and your advocacy on behalf of your client. My pleasure. We appreciate it. Thanks to both counsel. The court will take this case under advisement.